IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MEAGHAN EMILY M.,[1]        )
                            )
            Plaintiff,      )
                            )          CIVIL ACTION
v.                          )
                            )          No. 24-1145-JWL
LEE DUDEK,[2]               )
Acting Commissioner of Social Security, )
                            )
            Defendant.      )
_____ )

MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security denying Disabled Child's Insurance benefits (CDB) pursuant to sections 202(d) and 223 of the Social Security Act, 42 U.S.C. §§ 402(d) and 423 (hereinafter the Act). Finding no error in the Administrative Law Judge's (ALJ) decision, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

---

[1] The court makes all its "Memorandum and Order[s]" available online. Therefore, in the interest of protecting the privacy interests of Social Security disability claimants, it has determined to caption such opinions using only the initial of the Plaintiff's last name.

[2] On February 18, 2025, Mr. Dudek became Acting Commissioner of Social Security. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Dudek is substituted for Acting Commissioner Michelle King as the defendant. Pursuant to the last sentence of 42 U.S.C. § 405(g), no further action is necessary.

I.    Background

Plaintiff protectively filed an application for disabled child's insurance benefits on January 11, 2022. (R. 16, 193-96). After exhausting administrative remedies before the Social Security Administration (SSA), Plaintiff filed this case seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Plaintiff claims the ALJ failed adequately to evaluate the impact of her dysautonomia in the decision at issue.

The court's review is guided by the Act. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001). "Substantial evidence" refers to the weight, not the amount, of the evidence. It requires more than a scintilla, but less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988). Consequently, to overturn an agency's finding of fact the court "must find that the evidence not only supports [a contrary] conclusion, but compels it." I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481, n.1 (1992) (emphases in original).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting

Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord, Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005); see also, Bowling v. Shalala, 36 F.3d 431, 434 (5th Cir. 1994) (The court "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision.") (quoting Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988) (brackets in Bowling)). Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

An individual who applies for child disability benefits is eligible if she is an insured person's child, is dependent on the insured person, is unmarried, and has a disability which began before she became 22 years old. 20 C.F.R. § 404.350(a). Plaintiff became 22 years old on March 13, 2023, and meets all the other requirements for child disability benefits. Therefore, the question before the ALJ in this case was whether Plaintiff has a disability that began before March 13, 2023.

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability. 20 C.F.R. § 404.1520; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084). In the first three steps, the Commissioner determines whether

claimant has engaged in substantial gainful activity since the alleged onset, whether she has a severe impairment(s), and whether the severity of her impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's residual functional capacity (RFC).  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the process—determining at step four whether, considering the RFC assessed, claimant can perform her past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, she is able to perform other work in the economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one through four the burden is on Plaintiff to prove a disability that prevents performance of past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord, Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.  At step five, the burden shifts to the Commissioner to show that there are jobs in the economy which are within the RFC previously assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999).  The court addresses the errors alleged in Plaintiff's Social Security Brief.

**II.    Discussion**

"Dysautonomia is a disorder of the nervous system that disrupts the body's autonomic processes" such as "blood pressure, body temperature, breathing, digestion, heart rate, sweating, sleeping, [and] balance."  (Pl. Br. 10) (citing Dysautonomia,

4

Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/6004-dysautonomia (last visited March 27, 2025). Plaintiff asserts, "The condition affects her cardiovascular system, causing her to suffer frequent, extreme rises in heart rate, resulting in light-headedness and fatigue," and "also impacts her digestive system." (Pl. Br. 10). Plaintiff claims the ALJ failed adequately to evaluate her dysautonomia when assessing her RFC because the RFC assessed made "no allowances for breaks, absences, or other interruptions in productivity that would necessarily arise from [Plaintiff's] impairments." Id. 11. She argues the reasons for this failure are: The ALJ almost completely failed to address dysautonomia as an impairment, mentioning it only two times in his decision, and implicitly finding she does not have dysautonomia. Id. 12. He emphasized irrelevant evidence in his decision. Id. 13. He overlooked the significance of the most relevant evidence. Id. 14. He erroneously found Plaintiff did not seek greater treatment. Id. 15. And he erroneously evaluated the opinion of Plaintiff's treating neurologist, Dr. Chandrashekhar. Id. 15-17.

The Commissioner argues Plaintiff failed in her burden to show error because she failed to recognize that the ALJ found she has the autonomic system impairments of POTS (postural orthostatic tachycardia syndrome) and gastroparesis, and considered and discussed the symptoms Plaintiff reported from all of her impairments—both that evidence Plaintiff considered irrelevant and that she considered most relevant. (Comm'r Br. 10-12). He argues the ALJ did not discount the severity of Plaintiff's symptoms because she failed to seek additional treatment but because she did not always follow the treatment recommended by her healthcare providers. Id. 12. He argues, "At bottom,

5

Plaintiff's arguments amount to nothing more than an improper request for this court to reweigh the evidence, which it may not do on substantial evidence review. The question is not whether different, or even better, findings could have been made." (Comm'r Br. 13) (citing Lax, 489 F.3d at 1084).  The Commissioner concludes by arguing the ALJ properly found Dr. Chandrashekar's opinion not persuasive. Id. 13-15.

In her Reply, Plaintiff argues the Commissioner's Brief missed the point that the ALJ's emphasis on irrelevant evidence distracted from his consideration of the relevant evidence and failed to address the primary issue that the ALJ discounted the evidence most relevant to Plaintiff's dysautonomia.  (Reply 2).  She asserts the Commissioner's argument that the ALJ considered Plaintiff's POTS and gastroparesis, conditions related to dysautonomia "did not address the core issue—that the ALJ's failure to recognize dysautonomia resulted in the ALJ's misunderstanding of the root cause of [Plaintiff's] conditions, and thus, his inordinate focus upon irrelevant measures of functioning." Id. 3.  Finally, Plaintiff asserts the Commissioner's argument the ALJ correctly found Dr. Chandrashekar's opinion failed to provide work-related functional limitations was based on a strained reading of the opinion.

### A.     **Standards for Evaluating Impairments, RFC, and Medical Opinions**

As noted above, at step two of the sequential evaluation process, the ALJ must determine whether a claimant has any severe impairments.  20 C.F.R. § 405.1522.  Once an ALJ has found that a claimant has at least one severe impairment, a failure to designate another as "severe" at step two does not constitute reversible error because, under the regulations, the agency at later steps considers the combined effect of all of the

claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. Brescia v. Astrue, 287 F. App'x 626, 628-629 (10th Cir. 2008). But this is true only so long as the ALJ considers the effects "of <u>all</u> of the claimant's medically determinable impairments, both those he deems 'severe' and those 'not severe.'" Hill v. Astrue, 289 F. App'x. 289, 291-92, (10th Cir. 2008).

RFC is an assessment of the most a claimant can do on a regular and continuing basis despite her limitations. 20 C.F.R. § 404.1545(a); see also, White, 287 F.3d at 906 n.2. It is an administrative assessment, based on all the evidence, of how a claimant's impairments and related symptoms affect her ability to perform work related activities. Id.; see also SSR 96-5p, 1996 WL 374183, *5 (SSA July 2, 1996) ("The term 'residual functional capacity assessment' describes an adjudicator's findings about the ability of an individual to perform work-related activities."); SSR 96-8p, 1996 WL 374184, *2 (SSA July 2, 1996) ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s) ... may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The Commissioner has provided eleven examples of the types of evidence to be considered in making an RFC assessment, including: medical history, medical signs and laboratory findings, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, attempts to work, need for a structured living environment, and work evaluations. SSR 96-8p, 1996 WL 374184, *5.

Although an ALJ is not an acceptable medical source qualified to render a medical opinion, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record." Howard v. Barnhart, 379 F.3d 945, 949 (10th Cir. 2004). "And the ALJ's RFC assessment is an administrative, rather than a medical determination." McDonald v. Astrue, 492 F. App'x 875, 885 (10th Cir. 2012) (citing Social Security Ruling (SSR) 96-05p, 1996 WL 374183, at *5 (SSA July 2, 1996)). Because RFC assessment is made based on "all of the evidence in the record, not only the medical evidence, [it is] well within the province of the ALJ." Dixon v. Apfel, No. 98-5167, 1999 WL 651389, at **2 (10th Cir. Aug. 26, 1999); 20 C.F.R. § 404.1545(a). Moreover, the final responsibility for determining RFC rests with the Commissioner. 20 C.F.R. §§ 404.1527(e)(2), 404.1546.

The regulations include a section entitled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017." 20 C.F.R. § 404.1520c (2017). That regulation provides that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c(a) (2017). The regulation provides that the SSA will consider each medical source's opinions using five factors; supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 404.1520c(a)(c)(1-5) (2017). It provides that the most important factors in evaluating persuasiveness are supportability and consistency. Id.

8

The regulation explains that the decision will articulate <u>how persuasive</u> the SSA finds all medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(b) (2017). The articulation requirement applies for each source, but not for each opinion of that source separately. 20 C.F.R. § 404.1520c(b)(1) (2017). It requires that the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(2) (2017).

**B.     The ALJ's Relevant Findings**

The ALJ found Plaintiff had severe impairments of "gastroparesis, gastritis, postural orthostatic tachycardia syndrome (POTS), [and] palpitations/premature ventricular contraction with loop recorder." (R. 18) (finding no, 3, bold omitted). The ALJ noted that Plaintiff also had medically determinable impairments of Asperger's, depression, and anxiety which he found produced only mild limitations in the four broad mental functional areas and because "the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere." Id. 19-20. He found that Plaintiff's impairments, singly or in combination, do not meet or medically equal the severity of any impairment in the Listing of Impairments. Id. 20.

The ALJ assessed Plaintiff's RFC

to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and or carry 20 pounds occasionally and 10 pounds frequently. She can stand and walk for four hours in an eight-hour workday, and she can sit for six hours in an eight-hour workday. She can occasionally climb ramps and stairs but never climb ladders, ropes or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She should avoid all exposure to extreme cold and extreme heat. She should avoid all unusual hazards, defined in SSR 96-9p as "moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals." The claimant is able to apply common sense understanding to carry out detailed but uninvolved instructions in the performance of simple, routine, and repetitive tasks, in a work environment free of fast paced production requirements; involving only simple, work-related decisions; with few, if any, workplace changes.

(R. 21).

He summarized Plaintiff's reported symptoms:

The claimant testified that she has issues with tachycardia, and she easily tires because of her high heart rate. Symptoms include dizziness, nausea, confusion, sleep inconsistencies and lethargy. She has pain in the arteries in her neck with elevated heart rates as well as headaches. She has to sit, take breaks, or lay down [sic] with any activity including walking to the kitchen. She stated that she is deprived of oxygen with tachycardic episodes also described as a heart rate of 140 or greater, which occurs on a daily basis. She stated that episodes vary in length and because her symptoms are positional, she experiences bradycardia when she lays down [sic] and cannot do anything when her heart rate is slowed. She stated that her symptoms are attributed to dysfunction of her autonomic nervous system and consequently, her digestion is also affected. She experiences bouts of significant abdominal pain, feels nauseous, and full[—]depriving her of nutrition. She explained that she is currently at a relatively normal weight and that she has been told her body is packing on weight to prevent her body from returning to a state of malnutrition. She stated that because of her gastroparesis, she is terribly nauseous and is only able to eat 1 to 1.5 meals a day. She stated that tachycardic fits cause her to vomit up her meals. She also experiences bouts of constipation and diarrhea and has to eat bland food. She stated that she was forced to withdraw from school in the middle of the semester because her pain prevented her from being able to focus on her studies as she had before she became ill.

(R. 21-22). He stated he discounted Plaintiff's allegations of symptoms because they "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." Id. 22.

The ALJ explained the inconsistencies he relied upon to discount Plaintiff's allegations while he provided an extensive summary of the record evidence well-supported with citations to the record:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the evidence does not support the severity alleged. The records also contain some inconsistencies regarding the onset of the claimant's symptoms. The claimant attributed her symptom onset to a Covid infection in January of 2020, later indicating that the infection occurred in March of 2020. Other records indicate that her onset of symptoms occurred in June 2020 (Ex. 5F/20). Evidence shows that the claimant was seen for epigastric pain, nausea and vomiting in June 2020 reporting ongoing symptoms for two weeks. Lab work was unremarkable, and the claimant was placed on acid suppressive therapy with persistent symptoms (Ex. 1F/8). Bile gastritis was diagnosed by EGD biopsy (Ex. 1F/13). A HIDA scan was normal (Ex. 5F/37). Studies performed include gall bladder ejection function study, gastric emptying study, and abdominal ultrasound, and CT scan without findings to explain her symptoms. She was seen for gastroenterology consultation in July 2020 complaining of abdominal pain (Ex. 5F/20). She reportedly experienced improvement in symptoms when on medications including ursodiol, Carafate, pantoprazole and colestipol. When she was instructed to taper off the medications, her symptoms recurred (Ex. 5F/21). Subsequent studies for abdominal pain and nausea have been unremarkable. For example, in March 2021, the claimant underwent a CT scan of the abdomen and pelvis and with no acute findings, but she was noted to have chronic pectus excavatum deformity (Ex. 4F/13). The claimant's chronic symptoms have been managed with oral medication and Phenergan suppositories (Ex. 4F/14). Repeat gastric biopsies were normal in May 2021 (Ex. 4F/106).
>
> The claimant was diagnosed with postural orthostatic tachycardia syndrome in September 2020. This diagnosis was confirmed by a tilt table testing in May 2021 but otherwise showed normal autonomic function (Ex. 4F/106, 254). Orthostatic vitals showed stable blood pressure but a rise in heart rate

from 61 to 139 beats per minute between supine and standing for 2 minutes. Treatment included increasing the dosage of her medication propranolol, continue drinking fluids or Ensure between meals to increase hydration, avoid caffeinated fluids, eating smaller and more frequent meals, improve sleep hygiene, and other medications to address her symptoms (Ex. 4F/121).

Records reflect normal cardiovascular exams with the exception of tachycardic heart rate.  For example, in October 2020, on exam, her heart rate was elevated at 120 to 125 beats per minute (Ex. 2F/13).  In April 2022, her heart rate varied between the 60's to 120's.  She reported that she was renewing her [driver's] license and told someone she had a heart condition, and they gave her forms to be filled out.  Her treating provider noted that she had POTS syndrome, but she had not experienced syncope and that [when] she was seated, i.e. driving, her condition is stable, and she does not feel out of control or lightheaded or presyncopal (Ex. 2F/57).  The undersigned notes that the claimant testified that she did not drive and that when she needs to go out, someone drives her (testimony).  Treatment notes generally indicate that the claimant does not appear in distress, with normal appearance and mental function (Ex. 2F/57).  POTS syndrome is described in treatment notes as clinically stable (Ex. 2F/57).  Physical exams are grossly normal (See for example, Exs. 1F/8; 2F/79; 4F/61; 5F/18, 22, 35). Claimant's pulse rate is generally within a normal range as well (Ex. 4F/29, 36, 75, 85, 92, 99; 6F/19, 34).  Claimant testified to tachycardic fits and described tachycardia as 108 beats per minute and above and bradycardia as below 50 beats per minute.  In treatment notes, claimant [sic] pulse was noted at 115 in May 2021; however, there is no indication in the treatment note that her heart rate was abnormally elevated or that she needed to change positions in order to decrease her heart rate (Ex. 4F/107).  On a visit in September 2021, the claimant did report experiencing nausea when sitting up and she was asked to lay flat [sic] and given a cold compress which relieved her symptoms (Ex. 4F/128).  However, the claimant reported to the provider that her high pulse was normal due to POTS. Intermittently[,] treatment notes indicate elevated heart rate.  For example, in January 2022 when [s]he was evaluated for possible post viral dysautonomia, her heart rate was 125 (Ex. 4F/152[)]; see also a treatment note from July 2020, claimant's heart rate was 120 (Ex. 5F/22) and in June 2020 her heart rate was 52 (Ex. 5F/35).

She underwent implantation of a loop recorder and while she did experience extreme fluctuations, symptoms such as a hollow feeling in her chest were attributed to and correlated with sinus pauses with no further recommendations in terms of her treatment (Ex. 14F/17).  In October 2022, EKG studies showed sinus rhythm and interrogation of the implanted loop

>record showed no significant arrhythmia (Ex. 11F/10). Her POTS was characterized as improving and she was encouraged to increase water intake with electrolytes and continue physical therapy with follow up to occur in one year (Id.). Generally, the severity of symptoms described in claimant's testimony are not supported by the overall record and while she does have symptom exacerbations, they do not occur at a level of frequency and severity that would preclude all work. The undersigned has considered the claimant's severe impairments and the intermittent exacerbations documented in the treatment records in formulating the residual functional capacity and limiting the claimant to light work with climbing and environmental limitations which take into consideration objective studies and subjective symptoms to the degree supported by the records including the claimant's reported limitations in her ability to focus and concentrate when she experiences physical discomfort.

(R. 22-23).

The ALJ evaluated the prior administrative medical findings of the state agency physicians and found them partially persuasive, but that Plaintiff required greater limitations in walking, standing, and hazard precautions than opined by Dr. Lee and greater hazard limitations than Dr. O'Day opined. Id. 24. He then explained his evaluation of Dr. Chandrashekar's opinion:

>Swathy Chandrashekar, M.D., opined that the claimant had an inability to sit or stand for longer than five minutes due to extreme rise in heart rate resulting in lightheadedness, made worse by minimal exertion (Ex. 8F; 18F). Dr. Chandrashekar describes a limited ability to function or care for herself which is consistent with the claimant's subjective reports; however, not consistent with the overall record. Dr. Chandrashekar fails to cite objective support to substantiate the level of chronicity required to support the limitations and his opinion is in excess of what is reflected in the overall record. While there are intermittent episodes of exacerbations recorded in the medical evidence, the claimant's symptoms are not so severe that she is consistently unable to attend medical appointments for example, or walk from the car to the waiting room, or waiting room to the exam room. Additionally, the records do not support a conclusory opinion that the claimant is "… disabled from being able to work in any job I can imagine." Accordingly, he has failed to provide work related functional limitations, rather he simply supports the claimant's contentions of disability.

>Therefore, Dr. Chandrashekar's opinions are not persuasive (Exs 7F/21, 8F and 18F).

(R. 24).

The ALJ found, based on the testimony of the vocational expert, that with the RFC assessed, Plaintiff would be able to perform work in the national economy represented by jobs such as an order caller, an office helper, or a marker. Id. 26. He concluded that Plaintiff was not disabled before she attained the age of 22 and denied her application for disabled child's insurance benefits. Id. 27.

**C.     Analysis**

Plaintiff's argument the ALJ failed to evaluate her impairment of dysautonomia adequately is without merit. Here, the ALJ found that Plaintiff has a severe combination of impairments. Id. 18. Therefore, his failure to identify dysautonomia as one of Plaintiff's severe impairments is only error if he failed to consider the combined effect of all of the claimant's impairments without regard to whether dysautonomia, if considered separately, would be of sufficient severity. Hill, 289 F. App'x. at 291-92; Brescia, 287 F. App'x at 628-29. However, Plaintiff has not shown an effect of dysautonomia or of her other impairments which was not considered. Rather, she argues the ALJ did not give the correct weight to each of her impairments. As the Commissioner argues, this is, at its base, a request for the court to weigh the evidence differently than did the ALJ. But it is beyond the court's authority to reweigh the evidence or substitute its judgment for that of the Commissioner. Bowman, 511 F.3d at 1272; accord, Hackett, 395 F.3d at 1172; see also, Bowling, 36 F.3d at 434.

14

Plaintiff argues the ALJ emphasized irrelevant evidence. This is simply incorrect. Plaintiff objects to the ALJ's reference to medical tests in the record evidence which were "normal" or "unremarkable" and physical exams which were "grossly normal." The problem with this argument is that the ALJ is required to consider all record evidence, including, specifically, "medical signs and laboratory findings" and "recorded observations." SSR 96-8p, 1996 WL 374184, *5. Such evidence is relevant, not irrelevant, to every disability determination. Plaintiff argues that beyond the mere citation of this evidence, the ALJ compounded his error by "conclud[ing] they undermined the severity of [Plaintiff's] limitations." (Pl. Br. 13). However, the ALJ found Plaintiff's allegations of "symptoms are not entirely consistent with the medical evidence and other evidence" (R. 13), and that her symptom exacerbations "do not occur at a level of frequency and severity that would preclude all work." Id. 23. The normal or unremarkable findings cited by Plaintiff in her brief are part of the evidence tending to support these findings by the ALJ and are "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401. Finally, the court notes that the evidence cited by Plaintiff as erroneously "emphasized" does not appear to have been emphasized by the ALJ but was presented on an equal footing with all the evidence summarized by the ALJ.

Plaintiff next argues that the ALJ overlooked the significance of the most relevant evidence. In this regard, she argues she underwent a gastric emptying test which produced an abnormal result, and was subsequently diagnosed with severe gastroparesis; that she had a tilt table test which confirmed her diagnosis of POTS; and that she had a

15

loop recorder implanted which documented heart rate fluctuations between the 40s to the 150s, and "documented 'sinus pauses'—a temporary pause in the heart's electrical activity—lasting as long as four seconds." (Pl. Br. 14). Yet, the ALJ recognized Plaintiff's gastroparesis, POTS, and palpitations/premature ventricular contraction with loop recorder as some of Plaintiff's combination of severe impairments and discussed the record evidence regarding each, including extreme fluctuations in heart rate, tests relating to gastric issues, EGD's and gall bladder, and her tilt table tests for POTS. The problem appears to be that Plaintiff believes her condition is worse than the ALJ found it to be, but she does not point to record evidence that the ALJ erred in finding her symptom exacerbations are not of the frequency and severity to preclude all work and she does not point to record evidence that compels finding greater limitations.

     Plaintiff's argument the ALJ mistakenly faulted Plaintiff for not seeking greater treatment fares no better because the ALJ did not do so. As Plaintiff acknowledges, the ALJ recognized Plaintiff's medical providers attributed her reports of "a hollow feeling in her chest" to the sinus pauses documented by her loop recorder and noted that there were "no further recommendations in terms of her treatment." Id. 15 (quoting R. 23). This does not appear to indicate that Plaintiff failed to seek treatment for her sinus pauses, but the ALJ's recognition that the treatment note recorded that there was no further treatment recommended. And the treatment note cited by the ALJ states that Plaintiff has "had only 2 'hollow feelings' in her chest which have typically correlated with sinus pauses on her loop recorder. Her last sinus pause was 4s long and was noted by cardiology, message was sent to Dr. Dendi last month but no further recommendations have yet been

16

conveyed to Meaghan since." (R. 1577, Ex. 14F/17). Thus, the ALJ was simply reporting what the treatment note revealed, not that Plaintiff did not seek treatment.

Finally, Plaintiff argues the ALJ erroneously assessed the opinions of her neurologist, Dr. Chandrashekar. She argues the ALJ erred to find the physician "failed to provide work-related functional limitations, rather he simply supports the claimant's contentions of disability," because Dr. Chandrashekar opined Plaintiff is unable to sit or stand longer than five minutes, which is a work-related functional limitation. (Pl. Br. 16). She also argues the ALJ erred in finding the opinion inconsistent with the overall record because the record shows Plaintiff's heart rate spiked to 105 when she sat up from lying down; orthostatic vitals showed her heart rate spiked from 61 while lying to 139 when standing; and her "loop recorder reflected 'extreme fluctuations in her heart rate ranging from 40s to 150s' along with sinus pauses of up to 4 seconds." Id. 16-17 (quoting R. 1577 (Ex. 14F/17)).

Plaintiff's arguments regarding the ALJ's evaluation of Dr. Chandrashekar's opinion ignore the ALJ's explanation of his evaluation of the opinion, isolate evidence in support of the opinion, and hope the court will reweigh the evidence more favorably to Plaintiff's view. Each of the three incidents cited by Plaintiff to demonstrate Dr. Chandrashekar's opinion is supported by the record, contrary to the ALJ's finding that it is "not consistent with the overall record" (R. 24), were specifically cited and discussed by the ALJ in his decision. While Plaintiff emphasizes a spike in heart rate when she sat up at her skin biopsy in September 2021, the ALJ summarized the treatment note thus, "On a visit in September 2021, the claimant did report experiencing nausea when sitting

17

up and she was asked to lay [sic] flat and given a cold compress which relieved her symptoms (Ex. 4F/128 [R. 536]). However, the claimant reported to the provider that her high pulse was normal due to POTS." (R. 23). The record confirms the ALJ's report—"her pulse was high, however she reports that this is normal for her with her POTS diagnosis." Id. 536 (Ex. 4F/128). Similar to Plaintiff, the ALJ also noted, "Orthostatic vitals showed stable blood pressure but a rise in heart rate from 61 to 139 beats per minute between supine and standing for 2 minutes." Id. 22. The ALJ did not cite the basis for this note, but, as Plaintiff cited, it can be found at R. 535 or Ex. 4F/127. And while Plaintiff cites R. 1577 as noting "an implanted loop recorder reflected "extreme fluctuations in her heart rate ranging from 40s to 150s" along with sinus pauses of up to 4 seconds," the ALJ cited the same record, Ex. 14F/17, stating, "She underwent implantation of a loop recorder and while she did experience extreme fluctuations, symptoms such as a hollow feeling in her chest were attributed to and correlated with sinus pauses with no further recommendations in terms of her treatment." (R. 23).

While Plaintiff clearly does not agree with the ALJ's characterization of the records, the decision reveals the ALJ clearly considered all the record evidence Plaintiff relies upon to assert error in his evaluation. And the record supports the ALJ's findings. Moreover, and most importantly, the ALJ explained why he found Dr. Chandrashekar's opinion not consistent with the overall record: "While there are intermittent episodes of exacerbations recorded in the medical evidence, the claimant's symptoms are not so severe that she is consistently unable to attend medical appointments for example, or walk from the car to the waiting room, or waiting room to the exam room." Id. 24.

18

Throughout his decision, the ALJ has explained and documented his determination that the evidence demonstrates Plaintiff's impairments are severe, but her symptoms do not occur with the frequency or severity which preclude work within the RFC assessed in the decision.  Plaintiff has ignored the ALJ's explanation of the inconsistencies of Dr. Chandrashekar's opinion with the record.

The court next addresses Plaintiff's argument the ALJ erred in finding Dr. Chandrashekar "failed to provide work-related functional limitations, rather he simply supports the claimant's contentions of disability." (Pl. Br. 16) (quoting R. 24).  Plaintiff argues this is so because Dr. Chandrashekar opined Plaintiff "had an 'inability to sit or stand for longer than 5 minutes' due to her symptoms." Id. (quoting R. 1093, 1633, Exs. 8F/1, 18F/1).  Once again, Plaintiff ignores the true import of the ALJ's explanation of his evaluation of Dr. Chandrashekar's opinion.

> The ALJ explained his evaluation of the doctor's stated opinion
>
> that the claimant had an inability to sit or stand for longer than five minutes due to extreme rise in heart rate resulting in lightheadedness, made worse by minimal exertion (Ex. 8F; 18F).  Dr. Chandrashekar describes a limited ability to function or care for herself which is consistent with the claimant's subjective reports; however, not consistent with the overall record.  Dr. Chandrashekar fails to cite objective support to substantiate the level of chronicity required to support the limitations and his opinion is in excess of what is reflected in the overall record.  While there are intermittent episodes of exacerbations recorded in the medical evidence, the claimant's symptoms are not so severe that she is consistently unable to attend medical appointments for example, or walk from the car to the waiting room, or waiting room to the exam room. … Accordingly, he has failed to provide work related functional limitations, rather he simply supports the claimant's contentions of disability.  Therefore, Dr. Chandrashekar's opinions are not persuasive

19

(R. 24).  Thus, the ALJ found Dr. Chandrashekar's statement that Plaintiff was unable to sit or stand for more than 5 minutes was an unreasonably extreme limitation based primarily on Plaintiff's subjective reports, was inconsistent with the record as a whole, and was, therefore, not actually a work-related limitation but merely a limitation in support of Plaintiff's allegations.  This understanding is supported by the ALJ's evaluation and explanation of the record evidence regarding Plaintiff's allegations of symptoms and by the prior administrative medical findings of the state agency medical consultants, Dr. Lee and Dr. O'Day.

The court rejects Plaintiff's appeal to Hardman v. Berryhill, No. 2:16-CV-493-PRC, 2018 WL 1014233, at *11 (N.D. Ind. Feb. 22, 2018) for at least three reasons.  It is a district court decision and is not precedent binding on this court.  It applied the treating physician rule, which is not applicable here.  And it appears to be reweighing the evidence and may be substituting its judgment for that of the Commissioner.

Plaintiff has not demonstrated error in the ALJ's consideration of Plaintiff's impairments or of the persuasiveness of Dr. Chandrashekar's opinions.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's final decision.

Dated March 27, 2025, at Kansas City, Kansas.

s/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**